1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT DUWORS,

                Plaintiff,

     v.

PRUDENTIAL INSURANCE COMPANY
OF AMERICA and the PRUDENTIAL
GROUP LONG TERM DISABILITY
INSURANCE TRUST A,

                Defendants.

NO.

COMPLAINT FOR CONVERSION
POLICY/PLAN LONG TERM
DISABILITY BENEFITS AND IFCA
PENALTIES

PLAINTIFF ROBERT DUWORS alleges as follows:

## I.      PARTIES, JURISDICTION, AND VENUE

1.  PLAINTIFF ROBERT DUWORS is a Resident of King County, Washington and has

been a resident of King County Washington at all times relevant to this action.

2.  Defendant PRUDENTIAL is the administrator of the PRUDENTIAL GROUP LONG

TERM DISABILITY CONVERSION INSURANCE TRUST A which provides long

term disability to covered persons under insurance policy 22560.  PRUDENTIAL

COMPLAINT FOR DISABILITY BENEFITS- 1

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

made all decisions relevant to the disability claim of PLAINTIFF ROBERT DUWORS and provides the insurance policy that funds Trust A benefits.

3. PRUDENTIAL's principal place of business is in Philadelphia, Pennsylvania or Newark New Jersey.

4. PLAINTIFF ROBERT DUWORS is covered for benefits under the PRUDENTIAL Group Long Term Disability Conversion Insurance Trust A providing long term disability benefits under PRUDENTIAL policy 22560.

5. The benefits at issue exceed $75,000 in value.

6. Jurisdiction is proper under 28 U.S. 1332(a)

7. Venue is proper in King County, Washington.

## II.      FACTUAL ALLEGATIONS

7. PLAINTIFF DUWORS was employed by Microsoft as a Program Manager, Systems Analyst and Project Manager beginning June 23, 2008.

8. About four years after recuperating from that heart attack in 2004, PLAINTIFF DUWORS began working at his job at Microsoft.

9. PLAINTIFF DUWORS was covered by an insurance policy provided by Microsoft and issued by PRUDENTIAL while he was working at Microsoft.

10. PLAINTIFF DUWORS left his employment with Microsoft as a Program Manager, January 11, 2011.

11. PLAINTIFF DUWORS continued coverage after leaving employment for disability benefits by opting for a conversion policy for long term disability coverage offered to him through PRUDENTIAL GROUP LONG TERM DISABILITY CONVERSION

COMPLAINT FOR DISABILITY BENEFITS- 2

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

INSURANCE TRUST A and through the PRUDENTIAL Insurance Policy number 22560 funding the conversion coverage.

12. PLAINTIFF DUWORS paid monthly premiums for this coverage once he left his employment at Microsoft.

13. PRUDENTIAL established the PRUDENTIAL Group Long Term Disability Conversion Insurance Trust A and covered Mr. DuWors under Group Policy 22560 issued to the Trust effective January 12, 2011.

14. PLAINTIFF DUWORS understands that his coverage for his conversion insurance policy 22560 is under this Trust A maintained by PRUDENTIAL.

15. PRUDENTIAL manages the Trust and makes all decisions regarding claims for benefits granted through this Trust.

16. All of Mr. DuWors' communications regarding his claim have been with PRUDENTIAL.

17. In the partial certificate provided to PLAINTIFF DUWORS by PRUDENTIAL, PRUDENTIAL defines disability as follows:

"How Does PRUDENTIAL Define Disability?

You are disabled when PRUDENTIAL determines that due to your *sickness* or *injury:*
• you are unable to perform the *material and substantial duties* of your *regular occupation;*
• you are under the *regular care* of a *doctor,* and
• you have a 20% or more loss in your *monthly earnings.*

After 24 months of payments, you are disabled when PRUDENTIAL determines that due to the same sickness or injury:

• you are unable to perform the duties of any *gainful occupation* for which you are reasonably fitted by education, training or experience; and
• you are under the regular care of a doctor."

COMPLAINT FOR DISABILITY BENEFITS- 3

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

18. Subsequent to leaving Microsoft, Plaintiff DuWors developed a medical condition, his heart condition, which prevents Plaintiff DuWors from working at any job or in any occupation because of a known risk of further disability or death increased by working.

19. PLAINTIFF DUWORS has a heart condition which includes a cardiac arrhythmia/atrial fibrillation; a moderately severe 40% blockage of his Left anterior descending coronary artery, and a weakened heart/chronic systolic heart failure with a left ventricular ejection fraction of 45%.

20. Essentially PLAINTIFF DUWORS has three significant and disabling heart conditions which create a risk of death or further disability: (1) atrial fibrillation (AF) and atrial flutter and (2) ventricular arrhythmia.  He also has problems with PVC's which can convert to ventricular tachycardia.

21. Information about these conditions can be downloaded from the internet: http://www.nhlbi.nih.gov/health/healthtopics/topics/arr/types which discusses atrial fibrillation and the risks it poses those with the condition like Mr. DuWors, attached as Appendix 1

22. Still more information can be gleaned from the following website of the Mayo Clinic which defines and discusses the arrythmias at issue in this case:

http: //www.mayoclinic.org/diseases-conditions/heart-arrhythmia/basics/definition/con-20027707?p=1.  Attached as Appendix 2.

23. AF is the most common type of serious arrhythmia. It involves a very fast and irregular contraction of the atria.  In AF, the heart's electrical signals don't begin in the SA node. Instead, they begin in another part of the atria or in the nearby

COMPLAINT FOR DISABILITY BENEFITS- 4

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

pulmonary veins.  The signals do not travel normally. They may spread throughout the atria in a rapid, disorganized way.  This causes the walls of the atria to quiver very fast (fibrillate) instead of beating normally. As a result, the atria are not able to pump blood into the ventricles the way they should.

24. AF creates significant risk for PLAINTIFF DUWORS of further disability and death, due to stroke or heart failure.

25. PLAINTIFF DUWORS also experiences atrial flutter.

26. Atrial flutter  is similar to atrial fibrillation.  The heartbeats in Atrial flutter are more organized and more rhythmic electrical impulses than in Atrial Fibrillation. Atrial flutter may also lead to serious complications such as stroke.

27. Another major risk facing PLAINTIFF DUWORS is Ventricular tachycardia (Vtach). Ventricular tachycardia is a rapid, regular heart rate that originates with abnormal electrical signals in the ventricles. The rapid heart rate does not allow the ventricles to fill and contract efficiently to pump enough blood to the body. Ventricular tachycardia can often be a medical emergency. Without prompt medical treatment, ventricular tachycardia may worsen into ventricular fibrillation.

28. Ventricular fibrillation occurs when rapid, chaotic electrical impulses cause the ventricles to quiver ineffectively instead of pumping necessary blood to the body. This serious problem is fatal if the heart is not restored to a normal rhythm within minutes.  It has been called the widow-maker.

29. So clearly, these combined heart conditions create significant risk of death and further disability for PLAINTIFF DUWORS.

COMPLAINT FOR DISABILITY BENEFITS- 5

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

30. These multiple heart conditions make PLAINTIFF DUWORS' heart condition very difficult to treat.

31. PLAINTIFF DUWORS' treating cardiologist, Dr. Rodrigues and other cardiologists have warned him that he has so little reserve in his heart muscle that a second heart attack has a good chance of being fatal or forcing Plaintiff DuWors so far into heart failure that his quality of life would be dreadful and tenuous.

32. PLAINTIFF DUWORS also has uncontrolled high blood pressure which adds to his risk as medications do not adequately control his blood pressure. While on medication his blood pressure can spike high or low without warning. This further increases his risks.

33. PLAINTIFF DUWORS has had cardiac ablations which have, unfortunately not cured his condition.

34. PLAINTIFF DUWORS also had an implanted defibrillator, but it did not work for him creating a blizzard of shocks because of his atrial fibrillation, creating more risk for him than having no defibrillator.

35. Consequently, PLAINTIFF DUWORS had the implanted defibrillator removed.

36. PLAINTIFF DUWORS' treating cardiologist agreed that the defibrillator needed to be removed (calling it inappropriate) because of the adverse effects the defibrillator was having on him.

37. Because of his heart condition, PLAINTIFF DUWORS generally feels fatigued, and has been only able to engage in limited activity.

38. When PLAINTIFF DUWORS has atrial fibrillation or PVC's, he experiences even more fatigue than he generally feels, as well as disorientation and with a sense of

COMPLAINT FOR DISABILITY BENEFITS- 6

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

dizziness, and feeling unease especially if he was trying to finish something on the computer or even driving a car.

39. PLAINTIFF DUWORS, due to his heart condition, experiences what he calls "cardiac tired", a sense of being drained, like coming down with a virus or worse.

40. As Dr. Rodrigues has noted, he cannot assure any employer that PLAINTIFF DUWORS would be able to show up for work in any occupation five days per week, eight hours per day, 52 weeks per year, for years.

41. In fact, to the contrary, PLAINTIFF DUWORS is able to assure any employer that he would miss time regularly and unpredictably due to the condition of his heart and the accompanying fatigue and other symptoms.

42. Dr. Rodrigues has also provided PLAINTIFF DUWORS a medical excuse for jury service, making PLAINTIFF DUWORS no longer a candidate for jury service because of his heart condition.  Appendix 7.  He does not have the ability to sit in court as a juror and hear evidence and debate that evidence in the jury room.

43. The Social Security Administration has recognized that PLAINTIFF DUWORS is disabled and cannot perform any job in the national economy entitling PLAINTIFF DUWORS to SSD benefits which began in January 2012.

44. PLAINTIFF DUWORS applied for benefits under the PRUDENTIAL Trust due to his heart condition and a kidney bleed from anticoagulants he is required to take because of his heart condition.

45. PRUDENTIAL granted benefits, paying Plaintiff DuWors beginning January 28 2012 based on a letter they sent him dated February 27, 2012. (OCT 2014 PRUDENTIAL CF000856-858).

COMPLAINT FOR DISABILITY BENEFITS- 7

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

46. Cynthia Hopkins had calculated his benefit as $5500/month on March 1, 2011, well before Mr. DuWors made his claim. (OCT 2014 CF000713).

47. By that letter dated February 27, 2012 (OCT 2014 CF000856-858), PRUDENTIAL began paying benefits of $5500 per month stating the following:

> After reviewing your claim for Long Term Disability (LTD) benefits through PRUDENTIAL's Group LTD Conversion Trust Policy, we have approved your LTD claim. This letter outlines some of the programs and benefits that are available. Whenever possible, we want to work with you on your return to work efforts.
>
> Your monthly LTD benefit is 60% of your monthly earnings. Your LTD claim has been approved with benefits beginning January 28, 2012, following the completion of the elimination period. Your elimination period is 180 days. To be eligible to receive benefits, you must be continuously disabled from performing the material and substantial duties of your regular occupation during the elimination period.
>
> Your monthly benefits are calculated as follows:
>
> Monthly Earnings:
> Scheduled Benefit (60% of salary):
> $9,166.67
> $5,500.00
>
> Your LTD checks are issued five business days prior to the end of the month. The issuance date may vary from month to month.

48. PRUDENTIAL stopped paying PLAINTIFF DUWORS benefits January 27, 2014, notifying him they were stopping his benefits by a letter of the same date. (OCT 2014 PRUDENTIAL CF000800-804).

49. That letter states that PLAINTIFF DUWORS "discontinued working as a Program Manager on August 1, 2011 because he was unable to work in his regular occupation or any gainful occupation due to [his] cardiac condition(s)."

COMPLAINT FOR DISABILITY BENEFITS- 8

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

50. However, in fact, Plaintiff DuWors left Microsoft in January 2011 for reasons unrelated to his disability which is why coverage for this claim is under the Conversion Insurance Policy 22560 through the PRUDENTIAL Trust A.

51. The January 27, 2014 letter also recognized: "…You note that you have 'physical challenges and associated impact on required intellectual performance compounded by lack of reliably sustainable endurance' and you could not be counted on to make sustained effort as you are never sure when a physical or associated mental fatigue will strike.  Additionally you indicate you cannot travel on a regular or sustained basis without performance limiting exhaustion or risk of complications.  You also note that the hours typical of professional IT work are generally recognized to be in excess of 40 hours per week."

52. The January 27 letter goes on to set out the limits that treating cardiologist Dr. Rodrigues filled out in the Physical Capacity Questionnaire relating to lifting, sitting, standing, bending etc. (CF000802)

53. However the questions did not inquire about Dr. Rodrigues concerns about risks to Mr. DuWors health due to his cardiac conditions of atrial fibrillation, atrial flutter, and ventricular tachycardia (Vtach) and his recommendation that his patient stop working or risk death or further disability.

54. The letter goes on to say that his claim was reviewed by unspecified medical staff and that based on those reviews, "we find that the information documented in the current medical records support that your condition(s) have improved."

COMPLAINT FOR DISABILITY BENEFITS- 9

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

55. However there is no medical evidence that there has been any meaningful improvement in his conditions of atrial fibrillation, atrial flutter, and ventricular tachycardia.

56. The January 27 letter (CF000802) also states:

"Dr. Rodrigues noted in conversation with him on January 6, 2014 that you had severe underlying coronary artery disease and prior **inappropriate** implantable cardioverter defibrillator (ICD) shocks.  He indicated you refused further ICD implantation and noted that you have been diagnosed as having post-traumatic stress disorder on the basis of the inappropriate shocks.   Dr. Rodrigues indicated he did not believe you could work at your old job due to significant stress and noted that he was concerned if placed in a high stress environment, you may increase the amount of ventricular ectopy.  It was discussed that your recent stress echocardiogram was otherwise unremarkable and there was no evidence of ischemia and that you did not have daily chest discomfort and did not use nitroglycerin on a consistent basis.  Dr. Rodrigues discussed the psychological job stress may affect the perception of illness or functioning in the workplace."

57. Ventricular ectopic beats (ventricular ectopy or VEBs) are common and do not indicate a problem in people without heart disease.  *However, if a person has aortic stenosis,* **heart failure***, or a* **previous heart attack***,* **VEBs** *may be followed by* **ventricular tachycardia** *and* **fibrillation***, which can lead to sudden* **death***.*

COMPLAINT FOR DISABILITY BENEFITS- 10

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

58. This is part of the risk that PLAINTIFF DUWORS faces as he has a previous heart attack.

59. In fact this risk is further borne out by an episode in August 2012 when Mr. DuWors presented to the emergency room at Virginia Mason Hospital with severe tachycardia and was admitted to the hospital feeling lightheaded and dizzy.

60. The January 27, 2014 letter then goes on to say that PRUDENTIAL had consulted a PhD clinical resource "who indicated there is no indication of any treatment with mental health providers, and there is no indication of any psychiatric symptoms that would support psychological impairment that would preclude occupational function."

61. The January 27 letter (CF000803) offered the following Summary:

> As noted above, the medical information does not support that you currently have any medically necessary restrictions or limitations that would preclude occupational function.  As such your claim for LTD benefits has been terminated effective January 27, 2014, as we have determined you do not meet the definition of disability as defined above.

62.   The letter also dismisses the Social Security finding of Mr. DuWors inability to do any job in the national economy stating:

> "We have noted you were approved for Social Security Disability Benefits and we have taken this into consideration.  However, please note that the Social Security Administration (SSA) must make their determinations based on information available to them and their rules and guidelines, and we must render our decisions based on the information available in your LTD file and the provisions of the LTD Plan.  As such, the approval of one type of benefit does not mean that another type of disability benefit will be approved; nor does the denial of one type of benefit mean that another type of benefit will be denied."

63. The letter did not inform PLAINTIFF DUWORS about the differences PRUDENTIAL saw in the way Social Security evaluated claims for SSD benefits

COMPLAINT FOR DISABILITY BENEFITS- 11

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

versus the considerations they had in their evaluation of the LTD requirements in their

Policy 22560.

64. However, it is known that Social Security Disability requires that the claimant be

unable to work any job in the national economy, while the PRUDENTIAL policy

requires that the claimant be unable to work in any occupation based on the claimant's

education, training, and experience, an easier definition to meet than the SSD

definition.

65.  PLAINTIFF DUWORS, then retained Krafchick Law Firm, and we faxed a letter our

representation dated June 6, 2014 to PRUDENTIAL.

66. In that letter we requested a copy of the applicable insurance policy, which we now

know to be Conversion Insurance Policy 22560 and attached certificates.

67. We received what appears to be an incomplete copy of the policy in July 2014 in

response to our letter of representation which is at pages July 2014 PRUDENTIAL

CF000035-.41 and includes the Trust application but no evidence of the benefit

amount for Plaintiff DuWors.  This policy says that PRUDENTIAL will give each

Participant [which included Plaintiff] an individual certificate. It will describe the

Participant's coverage under the Group Contract.   It will include (1) to whom

PRUDENTIAL pays benefits; and (2) the limitations, exclusions and requirements that

apply.

68.  The July 2014  disclosed plan includes a Schedule of Plans with an effective date of

January 1, 2006 which describes that the Plan of Benefits that applies to the covered

class is:

COMPLAINT FOR DISABILITY BENEFITS- 12

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

(1)  The Coverage described in the Group Insurance Certificate prepared for the Group Contract shown bearing the code "LTD; 22560; Ed. 4/93".

(2) The Coverage described in the Group Insurance Certificate prepared for the Group Contract shown above bearing the code "22560, LTD Conversion, ED. 10-2005".

69.  We have not received copies of these Group Insurance Certificates which are supposed to be attached to the Group Contract and made part of it.

70. A portion of the policy also appears in the claim file we were provided prior to filing this lawsuit at pages CF000012 – CF000014 but the policy has a date of 2/23/2015 and simply provides a schedule of benefits, but not the complete policy, and not even the pages provided previously.  These pages do include a schedule of benefits which indicates that the benefit was $4000 per month but no indication where this is part of the Plan previously provided.

71. In paying the benefits, beginning in January 2012, PRUDENTIAL informed Mr. DuWors that his benefit was $5500 per month (as a response to numerous requests for the policy applicable to his claim) and paid that amount. (OCT 2014 PRUDENTIAL CF000856).

72. However, two years later in January 2014, Cynthia Hopkins at PRUDENTIAL informed Michelle Christakis at PRUDENTIAL that she had provided the wrong benefit amount.  The benefit that they had told Mr. DuWors he was entitled to was $5500 per month, but she indicates the benefit should be $4000 per month, and she entered a change rider in their computer system setting out this change.

COMPLAINT FOR DISABILITY BENEFITS- 13

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

73.  There is no stated reason why this was a mistake or how they determined the benefit was $4000/month in the claim file rather than $5500/month.

74. However Plaintiff DuWors had a salary of $109,992.00, and providing his annual benefit was 60% of that amount (as PRUDENTIAL had told him) his benefit calculate to

 $65,995.20 which divided by 12 produces a monthly benefit of $5499.60 which rounds to $5500 per month, the benefit PRUDENTIAL paid.

75. We have not been provided any of the certificates that set out the Benefit amount under Policy 22560.

76. Therefore it is unclear, at this time, why PRUDENTIAL changed the benefit amount.

77. So, now, while PRUDENTIAL has terminated Mr. DuWors benefits, PRUDENTIAL is seeking repayment of $36,000 which they say is due to overpaying his claim by $1500 per month for the 24 months PRUDENTIAL paid benefits.

78. So as noted, it remains unclear why the benefit amount was $4000/month rather than $5500/month, and if it was a mistake as PRUDENTIAL has said, how PRUDENTIAL caught the mistake.

79. Unfortunately, Mr. DuWors relied on the $5500/month amount of payment for managing his financial concerns as a result of being unable to work during the 24 months PRUDENTIAL paid him that amount.

80. He does not have the $36,000 to give  to PRUDENTIAL since they are asking him to repay them.

COMPLAINT FOR DISABILITY BENEFITS- 14

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

81. Krafchick Law Firm wrote Ms. Wende Whitten at PRUDENTIAL on behalf of Plaintiff DuWors on January 13, 2015 regarding PRUDENTIAL's claim for repayment of the $36,000.  Feb 2014 PRUDENTIAL CF000017.

82. That January 2015 letter sets out elements of the plan and the timeline of Mr. DuWors requests for copies of his plan as well as PRUDENTIAL's failures in adjudicating this claim stating the following:

> We note the following elements of the contractual agreement between Mr. DuWors and PRUDENTIAL:
>
> Page 1, [Form 22560, Ed. 08-2007]

- *This is your Certificate of Coverage.*
- *If you should have any questions about the content or provisions, please contact PRUDENTIAL's claims paying office.*

> *The benefits described in this Certificate of Coverage are subject in every way to the <u>entire Group Contract which includes this Group Insurance Certificate and any application form attached to this Certificate.</u>*

Page 2, [Form 22560, Ed. 08-2007]

- *<u>Group Contract</u> means the Group Long Term Disability Contract <u>shown in the Schedule of Benefits.</u>"*
- *Participant means <u>the person named in the Schedule of Benefits</u> who has been approved to become a participant in the Trust.*

Page 4, [Form 22560, Ed. 08-2007]

- *How May You Obtain a Copy of the Group Contract*
  - *We will provide you with a copy of the Group Contract when you write to us and request one.*

> Thus the full and complete contract of insurance between PRUDENTIAL as the insurer and Mr. DuWors as the policy holder and claimant consists of two parts:

COMPLAINT FOR DISABILITY BENEFITS- 15

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

1. Most centrally the Schedule of Benefits which binds the contract together by naming:

a) Mr. DuWors as a participant in the Trust

b) Specifies the Monthly Benefit (the critically withheld item which ultimately resulted in PRUDENTIAL's demand)

c) The Group Contract Number

2. The so-called entire Group Contract which itself includes:

a) The textual content of PRUDENTIAL internal Form 22560 as the contract of adhesion

b) Any attached applications

We further draw your attention to the Washington Insurance Fair Claims Act, in particular:

Washington Administrative Code 284-30-350 *Misrepresentation of policy provision.*

*(1) No insurer shall fail to fully disclose to first party claimants **all** pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented.*"

\* \* \*

The following is a brief chronology constructed from PRUDENTIAL's own Telephone Call Log and related records from the Disability Claims Management System (DCMS) as provided previously to Mr. DuWors before he was forced by PRUDENTIAL's repeated threats and demands to seek our representation:

### A Brief Chronology of PRUDENTIAL's Representations and Misrepresentations

Jan 11, 2012    PRUDENTIAL was informed: "*Robert DuWors is on the claim activity report however his employment terminated on 1/11/11*" by Becky Connell, Sr. Benefits Business Partner [Global Benefits], Microsoft Corporation (former employer).

Most importantly on the same day Charita Brown tells Mr. DuWors that he has the complete contract and Charita Brown enters: "*ee [sic] is requesting a copy of his policy*". Note: Mr. DuWors was not an employee of Microsoft or Trust A.

COMPLAINT FOR DISABILITY BENEFITS- 16

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

| | | |
|---|---|---|
| Jan 12, 2012 | Mr. DuWors faxes PRUDENTIAL - "*By means of this letter I am requesting **the full and complete** copy of the Group Contract mentioned in the Group Insurance Certificate.*" |
| Jan 13, 2012 | Nevertheless ignoring the facts already logged, Charita Brown enters: "*ee is requesting a copy of his policy*" and "*advised ee that we do not provide a copy of the policy and he will need to contact Microsoft. Ee stated he does not have contact with Microsoft*". |
| | Further ignoring the established facts in the log, Nefertari Williams places an outbound call to Mr. DuWors: "*advised ee that we do not provide a copy of the policy and he will need to contact Microsoft*" despite noting yet again "*ee stated he does not have contact with Microsoft.* |
| Jan 18, 2012 | Alexis Lonero again tells Mr. DuWors that he has the complete contract, "*ee advised that he has a converted LTD and He provided the contract # that is noted on his pprwrk (22560). EE advises* [rest cutoff]"   Note: unfortunately many of the logs provided in tabular format by PRUDENTIAL are truncated and thus incomplete due to misprinting. |
| | Alexis Lonero then sends exactly the same incomplete printout of the standard form contract boilerplate, PRUDENTIAL internal form number 22560, without the application retroactively cited for the first time by PRUDENTIAL exactly two years later, also without the Schedule of Benefits . |
| Jan 24, 2012 | Yet again Mr. DuWors is wrongly told he received the complete policy contract by Bethany Smith: "*Spoke with EE. EE advised he did receive the LTD policy* [sic]." |
| Jan 27, 2012 | Yet again Mr. DuWors is wrongly told by Bethany Smith he had the complete contract: "*EE confirms he received the policy.*" This was two days after Bethany Smith chose to ignore the authoritative document, the application, sent to her internally from the policy administration department. |
| Feb 27, 2012 | Mr. DuWors receives terms of claim approval from Bethany Smith: "*Your **LTD claim has been approved with benefits beginning January 28, 2012** ... **Scheduled Benefit (60% of salary): $5,500.00**".* |
| Feb 2012 thru Jan 2014 | Mr. DuWors receives payments in good faith exactly as expected in keeping with PRUDENTIAL's unwavering description while fully meeting his obligation to transfer $48,000 in clawed back cash and net payments to PRUDENTIAL. |

COMPLAINT FOR DISABILITY BENEFITS- 17

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

| | | |
|---|---|---|
| Jan 20, 2014 | | Michelle Christakis makes the gleeful phone call to Mr. DuWors. She states that she has found the application in the DCMS system that was available all along. She lays claim to $36,000 on behalf of PRUDENTIAL as part of reversing PRUDENTIAL's position by terminating benefits due to Mr. DuWors |
| Apr 29, 2014 | | For the very first time since the submission of the claim on Jan 4, 2012, Cynthia Hopkins finally sends an error filled Schedule of Benefits to Mr. DuWors which surprisingly welcomes Mr. DuWors to the Disability Trust A with an erroneous in-effect date of April 29, 2014 and notice of required payment of $206.67 monthly. In fact, however, PRUDENTIAL has not re-initiated the policy. |

Thus it is a mutually agreed matter of fact that PRUDENTIAL:

- withheld multiple times upon request from Mr. DuWors the most critical document, the Schedule of Benefits, which contained the most pertinent coverage benefit of all, the scheduled benefit amount of the monthly payment

- also withheld a copy of the original application by first claiming by word and action that it was not part of the entire Group Contract and then later retroactively claiming that it was

- concedes that Mr. DuWors is the totally innocent party

It is a fact that this originating failure in PRUDENTIAL's self-acknowledged long chain of claims processing missteps happened before approval of benefits and led in direct sequence to the $36,000 amount in total. PRUDENTIAL refused no less than five (5) times in bad faith to fully disclose the key pertinent benefit, namely the scheduled benefit monthly amount. Had PRUDENTIAL done so, Mr. DuWors and hopefully PRUDENTIAL's claim processing staff, would have been in a position to catch any subsequent problems. Instead PRUDENTIAL withheld the critical information, untruthfully provided false information, and defeated the multiple good faith efforts of Mr. DuWors at due diligence regarding his claim. It is further fact that PRUDENTIAL ultimately went on to discontinue his benefits while simultaneously and retroactively demanding $36,000 which had resulted from this failure to disclose the key and vital provision of the insurance contract. Thus it is a mutually agreed fact that PRUDENTIAL's own misbehaviors in breach of contract and violation of law were the originating cause in the chain of events leading to PRUDENTIAL's retroactive demand.

By documentation and mutual agreement of matter of fact, PRUDENTIAL went further and substituted and communicated on PRUDENTIAL letterhead misrepresentations and subsequent payment actions that misled Mr. DuWors

COMPLAINT FOR DISABILITY BENEFITS- 18

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

into relying in good faith upon PRUDENTIAL's words and deeds. PRUDENTIAL now seeks retroactive compensation for these self-confessed acts of breaching the contract and violating required lawful disclosure.

But PRUDENTIAL cannot now cherry pick the terms of the contract by first breaching it and then seeking compensation for the direct consequences of its own misrepresentations and bad faith claims processing. Neither can PRUDENTIAL deny that it violated the Insurance Fair Claims act by refusing to divulge pertinent benefits under which Mr. DuWors presented his claim. PRUDENTIAL cannot now seek to harvest the poisoned fruits of its own misbehavior. Had PRUDENTIAL simply complied with the terms of the contract and the law the whole situation would have been prevented before it began.

Mr. DuWors was not under obligation to produce the full interrelated pieces of paperwork in a PRUDENTIAL Group Disability insurance policy or insurance contract which at best are wrapped in verbiage opaque to a reasonable consumer and policy holder. But as noted, PRUDENTIAL does have that responsibility under contract and law. It further appears that PRUDENTIAL does not train its claims processing personnel in good faith to have such knowledge but disingenuously demands every policy holder and claimant to do so even in the face of refusal to cooperate and misleading actions by PRUDENTIAL.

PRUDENTIAL has failed under the doctrine of good faith and fair dealing so vital to contracts of insurance, uberrima fides, to fulfill its end of the bargain and now compounds that bad faith with this unwarranted demand for $36,000. An insurance company is not supposed to put its financial interests ahead of the insured policy holder and claimant. In regards to threaten collection practices, we caution PRUDENTIAL to tread carefully in light of damages that can also result from harm to reputation, personal and financial, by transmission to third parties of unwarranted claims known to be false or should have been known to be false. PRUDENTIAL should also consider that the Insurance Fair Claim Act allows award of up to three times for damages and related costs up due to acts of bad faith in claims processing.

Mr. DuWors relied in good faith upon the multiple representations of PRUDENTIAL which PRUDENTIAL led him to believe PRUDENTIAL had diligently and carefully processed his claim in good faith. He had no reason to set aside provision for PRUDENTIAL's actual multiple acts of bad faith in light of his due diligence up front to prevent them from happening. Mr. DuWors adjusted his standard of living to include the level of income expected and paid by PRUDENTIAL. Those payments and any portion of those payments became entangled in Mr. DuWors' life and do not exist any longer in fungible form. They have been totally spent. To now ask payment retroactively

COMPLAINT FOR DISABILITY BENEFITS- 19

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

for PRUDENTIAL's bad faith claims processing after defeating Mr. DuWors' best effort at due diligence would cause irrevocable harm to him.

While PRUDENTIAL cannot now ask to be bailed out for its own failure to perform under the terms of the contract, repeated violations the law, and the convincing but false expectations it established for Mr. DuWors, Mr. DuWors for his part has met all commitments and outstanding obligations under contract and law. Despite his expressed ethical objections, Mr. DuWors at the direction of PRUDENTIAL applied for and received Social Security Disability payments. Mr. DuWors then met his commitment in full to transfer $48,000 in cash and net payments to PRUDENTIAL in exchange for Social Security Disability monies received.

We note further to PRUDENTIAL's breach of contract, bad faith claims processing, and violation of law that Washington State recognizes the legal doctrines of promissory estoppel and estoppel by coverage.

PRUDENTIAL originally granted his claim during his own occupation period and paid the benefit he had come to rely on.  The benefit was terminated by letter dated January 27, 2014.  That denial was appealed by a letter from my firm dated July 30, 2014 and numerous exhibits.  In that letter we pointed out the well-established doctrine of common care and prudence which does not require someone to work if working creates a risk of further disability or even death. This is the situation with Mr. DuWors according to his treating interventional cardiologist and electrophysiology specialist, Dr. Rodrigues. It is reasonable for someone who faces any job that causes a risk of death or further disability to be deemed disabled under a disability policy.  This applies to the applicable group conversion policy covering Mr. DuWors because of his multiple medical conditions including his complicated cardiac electrical dysrhythmias that qualify Mr. DuWors to meet the definition of disability for SSD benefits (inability to work in any job in the national economy), thus he should be receiving his LTD benefits.

Nevertheless, PRUDENTIAL propounds the astounding medical theory that unbeknownst to Mr. DuWors or any of his multiple treating cardiac electrophysiology specialists, Mr. DuWors allegedly experienced a truly miraculous spontaneous recovery from multiple chronic and irreversible forms of heart disease and complicating pulmonary dysfunction to reach complete employment health. With no further medical evidence of its own, PRUDENTIAL shrugs off the advice and opinion of the treating physician, Dr. Rodrigues who has extensive experience treating Mr. DuWors with the most advanced techniques of modern cardiology.  PRUDENTIAL's grounds this reversal of its own initial finding of disability by reliance on outsourcing to underqualified non-interventional generalist cardiologists who worked from treating physician notes at a great distance and strictly second hand. Those

COMPLAINT FOR DISABILITY BENEFITS- 20

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

rendering these opinions did not and cannot adequately address Mr. DuWors'
multiple structural, arterial, and cardiac electrophysiological conditions and
their interactions compounded by verified low oxygenation levels during sleep
apnea which does not always respond to CPAP therapy. These reviewers who
were solicited on behalf of PRUDENTIAL do not appear to have adequate
cardiology specialization to judge Mr. DuWors' condition. Literally in
practice, they do not have the ability to perform the kinds of advanced modern
interventional cardiology treatments which have kept Mr. DuWors alive. Nor
have they ever examined Mr. DuWors.  In their actual practice the physicians
who PRUDENTIAL paid can offer experience in treatment little different from
any general family practitioner: pills, looking at test results, and diet advice.
They would likely be lost in a catheter lab where the miracles of modern life
saving cardiology take place. Their remunerative attempts to challenge the
informed findings of the treating cardiac electrophysiology specialist, Dr.
Rodigues, are suspect and invalid. Thus the very basis of PRUDENTIAL's
insistent rush to to deny Mr. DuWors' benefits does not withstand close
examination in good faith.

Besides our well documented appeal which has been denied for what we
believe to be unfounded reasons, prior to preparing the option to appeal, we
want to make sure we have everything you have regarding Mr. DuWors' claim
so we can properly advise our client.   In particular, we need to understand on
what basis you ignore and discount the doctrine of common care and prudence
endorsed by treating physicians to keep Mr. DuWors from working and
creating an unacceptable risk of further disability and even death.  Death would
work well for PRUDENTIAL as it would end their obligation to pay disability
benefits.  This common sense disability theory applies equally in the ERISA
context and in the non-ERISA context.  Yet your reviewers dismiss it as
irrelevant.

 You have sent us the supposedly complete claim file, but no policy and
procedures related to cardiac claims. We can see no commonly accepted
standards or even any PRUDENTIAL internal criteria by which you
objectively make decisions on a consistent, non-discriminatory, and even
handed basis for these claims. The outsourced opinions clearly fail to
demonstrate an understanding and valid standards for evaluating cardiac
electrophysiological conditions by wrongly centering on measures and issues
out of context that are not directly or not solely the medical basis of Mr.
DuWors' claim. Furthermore you do not seriously consider the applicable legal
doctrine.  By such loose standards anyone with normal blood pressure might be
said not to be disabled according to such disingenuously labelled "object
evidence". Not every cardiac condition is heart failure, even in the presence of
heart failure.

So, please immediately send your cardiac claim policies and decision
making procedures and any supporting decision making criteria that is part of
your claims handling processes, training, procedures, and administrative
operating policies available to your employees and consultants.

COMPLAINT FOR DISABILITY BENEFITS- 21

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

In particular we ask for a copy of the Claims Handling training material that has or should have addressed the training of PRUDENTIAL cardiac claims handling and policy administration staff (whether in-house or outsourced), and how PRUDENTIAL's disability group contractual agreements are structured and recorded to comply with Washington State law. These may well further involve sources of information such as the user guidance on the operation of the Lynx Life Administration system and the Disability Claims Management System.

Based on our review of the materials received so far, your records have references to a number of meetings but no records from those meetings, most critically the meeting notes and minutes. We anticipate receiving those for our examination as well.

Your records also reference communication with the Legal Department and others in regards to Mr. DuWors' claim. Any such records directly related to handling the claim and therefore are not privileged. We ask they be provided. This includes but is not limited to issues of eligibility, ERISA status, criteria used in decision making, and any matter of coverage and payments for cardiac claims, or group claims in general.

We note a curious lack of recorded communication with any higher levels of the organization in regards to this claim. Please include any such records and communications as well.

Most critically you did not send to us the Telephone Call Log from the DCMS system which is a grave failure to disclose as it is the key document for understanding what transpired to lead to your $36,000 claim against Mr. DuWors, your insured.

Also, please send us information on the background and qualifications of the consultants you used to evaluate the claim and to disregard the recommendations of his treating cardiac electrophysiology specialist. We would like also to know whether they understand the doctrine of common care and prudence, and, if so, how they got that understanding.

Email and fax being so essential to decision making in business today, we ask that the records provided be inclusive of but not limited to all relevant emails and faxes relating to PRUDENTIAL's processing of Mr. DuWors' claim exchanged between members of PRUDENTIAL's staff as well as between PRUDENTIAL's staff and all outside experts or services.

We ask that all information and data be formatted so that it is complete and no information is lost.

We ask that records from all sources be complete up to at least the date you prepared the response to this request.

Given PRUDENTIAL's demonstrated unwillingness to cooperate on appeal deadlines, time is of the essence in making our request and we ask that PRUDENTIAL fulfill it in a diligent and timely manner. We have been

COMPLAINT FOR DISABILITY BENEFITS- 22

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

provided 180 days from receipt of the October 14, 2014 which received by fax on October 17.  That means we have until 04/13/2015 to submit an appeal.  You have also informed us that this is a voluntary appeal and the we can also choose to litigate this claim without undergoing a second appeal.  We are requesting the information above to make sure we have all necessary information to make an informed decision whether to file a lawsuit or submit a further appeal.  Your prompt attention to our requests will be greatly appreciated.  You need not answer any of these requests at this time if you agree to restore Mr. DuWors benefits and waive the $36,000 claimed offset.

Please note that in Washington State failure to provide full disclosure of pertinent benefits in itself constitutes actionable misrepresentation of policy provisions.

83. Leaving these events, and going back to July 30, 2014, Krafchick Law Firm

submitted an appeal on behalf of Mr. DuWors.  The letter of appeal stated:

Your unwillingness to extend time for us to submit material to support Mr. DuWors disability claim is consistent with your determination to deny his claim.  It shows lack of consideration of the need to afford Mr. DuWors an adequate chance to appeal his case and submit supporting material.  It also demonstrates your lack of professional courtesy.  As you know his primary treating physician for his cardiac problems is Dr. Derek Rodrigues.  We had no assurance that Dr. Rodrigues would provide a report in the time you allowed.  Fortuitously, Dr. Rodrigues provided a report earlier this week to explain his unwavering opinion why Mr. DuWors should not work, and the imminent danger  (risk to health and life)and inevitable consequences to him if he tries to work.  That will be discussed below.

As of the Mr. DuWors June 1, 2014 visit with his cardiac physician, Dr. Rodrigues has made the following diagnoses:

1. Coronary artery disease (CAD)
2. History of acute anterior wall Myocardial Infarction
3. Ischemic cardiomyopathy
4. Implantable Cardioverter-defibrillatory (ICD) lead failure- SJM Riata LAD explanted
5. Atrial fibrillation (A-fib)
6. Status post ablation for A-Fib
7. Benign essential hypertension
8. Near syncope
9. Premature beats, unspecified
10. Mixed hyperlipidemia.

COMPLAINT FOR DISABILITY BENEFITS- 23

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

It is my understanding from review of the claim file materials and even your record reviewing physician's report, you do not dispute these diagnoses, but do dispute the consequences of these diagnoses.

The opinion that Mr. DuWors has no restrictions based on his cardiac condition has no basis in reality. Any significant stress can trigger Mr. DuWors' cardiac symptoms that could further deteriorate his function or cause death. These symptoms include overwhelming fatigue with minimal activity, pain, and limits on his ability to walk for any distance, as well as pain. Needless to say a normal work day would produce the certainty of these symptoms developing leading to a worsening of his condition or even death. Under these conditions, work is not an option. Even the stress of having to appeal this claim has caused symptoms to increase concerning his cardiologist. Specifically just the stress you have created by denying his claim, as Dr. Rodrigues observed, has already produced "poor blood pressure control despite multiple medications and in an increase in ventricular arrhythmia in a patient with a history of life-threatening V-tach [ventricular tachycardia] no longer protected by an ICD."

The symptoms of Ventricular Tachycardia are well known. They include:

1. Rapid heart rate
2. Palpitations
3. Chest pain
4. Chest discomfort
5. Faintness
6. Lightheadedness
7. Reduced blood pressure
8. Shortness of breath
9. Loss of consciousness (in severe cases)
10. Breathing cessation (in severe cases)

The symptoms of atrial fibrillation are also well known. They include:

1. Heart palpitations
2. Irregular pulse
3. Shortness of breath, especially during physical activity or emotional stress
4. Weakness, fatigue
5. Chest pain
6. Dizziness, confusion
7. Lightheadedness or fainting (syncope)

COMPLAINT FOR DISABILITY BENEFITS- 24

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

Atrial fibrillation also carries the risk of a stroke due to pooling of blood during the episode and clotting in the pooled blood as the episode stops leaving the pool to clot.

So what happens if Mr. DuWors attempts to work a regular schedule of 40 hours per week or even just 8 hours in a day, subject to the physical and mental demands of work as well as the inevitable stress of work?  He runs the risk of triggering his atrial fibrillation along with his ventricular tachycardia. He runs the risk of fainting, loss of consciousness, stroke, and even death. This is a choice no reasonable person would make exercising a common degree of prudence for his health and life.

There is a concept of disability in disability cases which applies in this non-ERISA case:  **common care and prudence.**  This doctrine essentially establishes that if work activity increases the risk of further disability or death (risking an insured's health and life), then the condition or conditions causing this unacceptable risk causes the person to be unable to work in any occupation under the definition of disability at issue here.  **A person is not required to ignore common care and prudence and put himself in a position of significant risk to life and health by working**.  *See Lasser v. Reliance Std Life Ins Co*., 146 F. Supp. 2d in which the court stated the doctrine well in the context of a disability based on cardiac conditions:

Finally, the Court cannot accept Walsh's analysis of risk of future harm in relation to present disability under the terms of the disability policy. **It is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health.** See <u>*Stark v. Weinberger,* 497 F.2d 1092, 1098-99 (7th Cir. 1974)</u>; <u>*Oppenheimer v. Fomch,* 495 F.2d 396, 398 (4th Cir. 1974)</u>; <u>*Stillwell v. Sullivan,* 1992 U.S. Dist. LEXIS 20242, 1992 WL 401971</u>, *6 (D. Kan., Dec. 30, 1992). **As noted in the Applemans' treatise, "The insured is considered to be . . . disabled where it is impossible for him to work without hazarding his health or risking his life."** 1C Appleman, Insurance Law & Practice § 651 at 241 (1981). *[Appleman's is a very well regarded insurance law treatise.]* **In fact, this proposition is sufficiently well-settled that in many jurisdictions it travels under the name of the "common care and prudence rule."** E.L. Kellett, Annotation, Continuation of Work as Affecting Finding of Total or Permanent Disability within Insurance Coverage, <u>24 A.L.R.3d 8</u>, § 3(a) (1969); see, e.g., <u>*McGowan v. Orleans Furniture Inc*., 586 So. 2d 163, 166 (Miss. 1991)</u>; <u>John Hancock Mut. Life Ins. Co. v. Poss, 154 Ga. App. 272, 267 S.E.2d 877, 880 (Ga. App. 1980)</u>.

**Insureds with heart conditions or who have experienced heart attacks provide an obvious context for the application of these**

COMPLAINT FOR DISABILITY BENEFITS- 25

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

**principles**. E.L. Kellett, Annotation, Heart or Vascular Condition as Constituting Total or Permanent Disability within Insurance Coverage, 21 A.L.R. 3d 1383, § 3 (1968). **Where medical prudence requires a cessation of work activity, the insured is disabled; insurers have failed to convince courts that risk of a heart attack in the future does not constitute a present disability. Pompe v. Continental Cas. Co., 119 F. Supp. 2d 1004, 1010 (W.D. Mo. 2000)**("Such an approach would force patients with serious health risks to cripple themselves, or even risk death, in order to be considered disabled. . . . The law is not so harsh.") (citing *Herring v. Canada Life Assur.* Co., 207 F.3d 1026 (8th Cir. 2000)).

This is true even though the insured may be capable of physical activity. Honeysucker v. Bowen, 649 F. Supp. 1155, 1162 (N.D. Ill. 1986). **Clearly the risk of a heart attack may be a disabling factor even though the claimant can sit, stand, or ambulate.** Schlabach, 469 F. Supp. at 314; Avemco Life Ins. Co. v. Luebker, 240 Ark. 349, 399 S.W.2d 265 (Ark. 1966).

The *Lasser* case is cited for this proposition of common care and prudence in many other cases. It is most likely a Court will apply this doctrine in Mr. DuWors case if it comes to litigation. In fact the case has been cited in the Arizona Federal District Court with approval. *Schwartz v MetLife*, 463 F.Supp 2d 971(Arizona 2006)(In the context of insurance law, **"'[t]he insured is considered to be … disabled where it is impossible for him to work without hazarding his health or risking his life.'"** *Lasser v. Reliance Standard Life Insurance Co.*, **146 F. Supp. 2d 619, 628 (D.N.J. 2001)**(quoting 1C *Appleman Insurance Law & Practice* § 651 at 241 (1981)), *aff'd*, **344 F.3d 381 (3d Cir. 2003)**.).

     **Dr. Rodrigues' report clearly places Mr. DuWors in this category of disability due to the risk to his health and life he faces by continuing to work**. Dr. Rodrigues confirms that Mr. DuWors' two primary disabling conditions are **ventricular tachycardia** and **atrial fibrillation**. **Each one carries the risk of stroke or death. Together they pose an unreasonable risk to Mr. DuWors continuing to work: disability from stroke or death.** At a minimum, even without the risk of stroke or death, the inherent stress in work activity would cause predictable but unscheduled absences from work or notable lack of productivity combined with the need to leave work early to go home or to a hospital.

     As Dr. Rodrigues succinctly states based on his knowledge of Mr. DuWors and his extensive experience treating similar cardiac patients:

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

"…[Mr. DuWors] has an **ongoing** risk of recurrent MI/cardiac arrest/stroke, and death."  Dr. Rodrigues continues:

> His symptoms increase with activity, stress and wax and wane unpredictably.   He would have considerable difficulty predictably working 8 hours per day, 5 days per week, 52 weeks per year and year after year.

> **It remains my opinion as a physician who has followed Mr. Duwors and his complex cardiac condition for many years and my own clinical experience in treating hundreds of patients like Mr. Duwors that he is unable to work at any gainful occupation for which he is reasonably qualified taking into account his training, education, and experience.**

Mr. DuWors shares his own experience in his statement submitted to support his appeal of the denial of his disability claim which he calls "My Symptoms Taken to Heart – A Survivor's Story":

> I have been told by every physician since my heart attack eleven years ago that I am at increased risk of another heart attack but especially of Sudden Cardiac Death from the scarring on the left side of my heart. Dr. Rodrigues and other cardiologists have warned that I have so little reserve left in my heart muscle that a second heart attack has a good chance of being fatal or forcing me so far into heart failure that my quality of life would be dreadful and quite possibly tenuous. The aftershocks linger from having survived while fully conscious a major heart attack which all of the doctors refer to as "the widow-maker". I remember the first responding paramedic looking down on me with concern to announce I was having a major heart attack. I remember living long enough to arrive in the ER. I remember five seconds of no heart beat (Sudden Cardiac Arrest) which was strangely peaceful because there was no urge to breathe either. I remember increasing concern from the medical staff about my "funky heart rhythm" and barely making it through some place they called the Cath lab where after placement of something they called a stent brought a feeling as if air rather than fluid suddenly started moving through my body. I remember thinking, what do you know, I am still alive for some indefinite period. I also know exactly the stretch of road where I would have died had I gone home as planned before a colleague asked me to stay for the dinner which I did not get to attend. Only the dumb luck of being five minutes from one the finest cardiac hospitals in the nation separates me from having died at the age of 51 along 1-75 somewhere near Findlay, Ohio. Since then I am acutely aware of the arbitrary and sudden onset

COMPLAINT FOR DISABILITY BENEFITS- 27

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

of cardiac conditions, from the pilot training I received some time ago, I am constantly prepared for what will I do, where will I go, if things go seriously wrong. l track the locations of nearby hospitals and medical facilities. I still get nervous far from home or in the woods. I never travel without my cell phone. But rather than live a life of total fear, I also accept that my death may come unexpectedly in a place about which I can do nothing because every single human being lives under those conditions, my odds are just worse.

The hardest part of this experience is that it compounds the seemingly endless series of severe heart problems I have had ever since. I know each severe episode of arrhythmia may end in vtach or vfib and that Sudden Cardiac Arrest has a very poor survival rate. In the summer of 2012 I had to fly nine hours across the Pacific Ocean with blood thinner needles that I had to stick into myself after the local Japanese hospital and two stays in the US Naval Hospital Yukosuka could not stop my unrelenting atrial flutter, first cousin to atrial fibrillation. It was finally terminated in back here in Seattle after great care was taken, which was physically unpleasant at the time, to screen out the possible presence of a blood clot often associated with prolonged atrial fibrillation and flutter that might have caused a heart attack or stroke after they succeeded in stopping the arrhythmia. While in Japan, I knew something was wrong because I had an unusually long enduring fatigue and turned down a chance to tour the USS George Washington, the forward deployed air craft carrier for the Seventh Fleet which struck me as odd behavior for myself. Upon checking the rhythm of my pulse, my suspicions proved to be true and that is how I detect atrial flutter which can be quite subtle but really debilitating. That is also precisely why I would prefer not travel for business. I have no desire to put my safety and even my life at risk.

When I have atrial fibrillation I experience as much and sometimes even more fatigue, disorientation, and the inability to finish anything that I start, while trying to reason things out becomes difficult and cloudy, and computer based tasks become excruciating. When atrial fibrillation, atrial flutter, or intense Premature Ventricular Contractions begin while I am awake, I feel the sudden their onset like being grabbed along with dizziness and a feeling of unease, especially if am driving or trying to get critical tasks done on the computer. That is why I know my ability to accomplish projects on time which is the hallmark of my profession has been severely compromised. I could not promise to commute every day by car or by public transit or to go out for business purposes which are also required by any job I have ever had. While I have learned to tell my major three

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

arrhythmias apart by feeling the rhythm in my pulse, they all produce what I call "cardiac tired", a sense of being drained like coming down with a major virus or worse. Every fellow patient to whom I have described this term has smiled and agreed. These are symptoms I would experience in any job in any occupation I could do. I am also aware that atrial fibrillation and atrial flutter increase the risk of stroke or other dangerous blockage somewhere else in the body, things I really don't want to experience.

I am aware my supposed "non-fatal" arrhythmia potentially can trigger Sudden Cardiac Arrest. Especially given the intensity of the episodes that have hospitalized me over ten times, I am aware that I am at heightened risk that one day they will trigger vtach and a Sudden Cardiac Arrest. While I cannot predict their onset I have experienced that over-exertion at levels that would be normal for a person without my problems or myself before my heart attack as well as stress bring about arrhythmia far more frequently than they show up otherwise. Work produces and requires regular stress, often generating periods of heighten tension as deadlines loom near, and requires overexertion by the standards of what I can safely handle. In terms of employment I do not wish to literally work myself to death attempting a schedule of 5 days a week.

Additionally I get days of high blood pressure. I have no way to know when these high blood pressure days will come. None of my blood pressure medicines which work most the time can stop this. My symptoms include restlessness, inability to concentrate, a mild sense of unease, and often being grouchy. I have long called these my "high blood pressures day." Most often I become suspicious when it is unusually hard to get anything done or when physical effort like walking uphill becomes strangely hard. As the recommended best and safest form of exercise for my twitchy cardiac conditions I sometimes try walking in my neighborhood which has some hills. Since I was alerted to these high blood pressure days in a job examination long ago, I have checked my blood pressure with a blood pressure cuff. By the time I get suspicious of abnormal blood pressure I have found that I have about 90% accuracy in predicting that a blood pressure problem is actually ongoing rather something else, which is often an arrhythmia. The vast majority of the time my BP elevates to the same higher range around 150/95 jumping up from my normally medicinally controlled levels around 120/70, occasionally on a really bad day it will be significantly higher, my "personal best" recently hitting 180/105 in a more recent trend that concerns me. I have been told by my doctors that uncontrolled blood pressure increases the risk of heart attack and the risk of stroke and

COMPLAINT FOR DISABILITY BENEFITS- 29

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

1   the risk of fatal arrhythmia beyond my already elevated levels of risk
2   from all my other cardiac conditions.

3   Starting several years ago I found a new symptom of extreme fatigue and
4   inability to walk up hill on a Bellevue walking trail. That turned out to be
    a "low blood pressure day" which are even more draining and fatiguing
5   than high blood pressure days, but are less frequent. I get these swings at
    least monthly and sometimes for several days in a row. I have had
6   periods were they were continuously bad for nearly four months.
    Given my other cardiac risks, these low blood pressure days also
7   concern me. I have noticed that my arrhythmias are often
8   accompanied by high blood pressure, but the blood pressure swings
    can happen on their own. Although I have been concerned about
9   these low blood pressure days, I have found no way to predict them
10  other than being under tension, inevitable with any work, increases
    the risk.

11  Lastly, I would like to make a comment with which I am sure my
12  doctors would agree, I don't have one cardiac condition but rather a
    constellation of them. This leads my doctor to refer to my heart
13  condition as complex. Each cardiac condition by itself would not be
    particularly unusual but the combination is, which makes treatment
14  and my situation much more difficult to manage. I have had many
    cardiac specialists say to me that I am a "complicated case" and their
15  body language indicated not in a good way. My greatest concern is
16  that my multiple and compounding conditions keep shifting around,
    some worse for a while, some doing better for a while, and every now
17  and then a new symptom joins the unhappy family. I am proud that
18  my heart started out strong enough to make it this far, but I never
    know minute by minute what new unpleasantness will arise such as a
19  very painful kidney bleed or a newly enhanced form of arrhythmia. If
20  any normal person including a cardiologist thinks I am just fine, I will
    gladly swap hearts with them. I do believe they will fall silent at that
21  offer.

22  In summary, I cannot safely work in any job with my heart condition.
23  Physical and other stress that comes with any work environment
    creates an unacceptable risk to my health and to my life. Since I have
24  been off work, with the exception of the stress produced by my denied
    disability claim, I have been better able to manage my symptoms and
25  reduce the risks to my health and continued survival. I still experience
26  fatigue and disorientation when my heart conditions act up. Any job
    involving intellectual work requiring similar levels of education,

COMPLAINT FOR DISABILITY BENEFITS- 30

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

training and experience will require the same level of mental sharpness and concentration as my IT job due to the requirement to sustain focus on analytical thinking throughout the day. This also requires a level physical stamina and cognitive ability that I no longer have. Thus what prevents me form continuing as an IT professional will prevent me from doing any other job. I could not guarantee any employer that I would be able to regularly show up for work, and if I did show up, that I could stay and be productive for a full eight hour day. I would have days absent because of one or more of my heart conditions acting up. I would not be able to concentrate with the inevitable stress that work produces. I would risk aggravating my already precarious condition and make things worse for my health, or even die. My doctor wants me to avoid that stress, and supports my disability claim. He does not want to see me further damage my health or increase my risk of death. Neither do I.

Between the statement of Mr. DuWors and the support from his very experienced treating cardiologist, Dr. Rodrigues, in light of the well accepted doctrine in disability law (common care and prudence), PRUDENTIAL should reverse its decision and grant Mr. DuWors his disability benefits owing since PRUDENTIAL terminated his claim and continue his benefits to his maximum benefit age. Nothing about Mr. DuWors heart conditions is likely to improve. His experience now at best will stay the same, but could at any moment in time deteriorate. Please reduce the unnecessary stress denying his claim has produced aggravating Mr. DuWors medical condition, and grant his benefits.

Finally there is one more issue that needs to be addressed in this appeal: the claim for repayment that PRUDENTIAL has asserted based on the alleged overpayment of his claim. The total amount sought is about $36,000. This claim should be waived. In Washington we have the Insurance Fair Claims Act passed by the voters. That provides for treble damages for an unreasonable denial of a claim for benefits or payment along with attorney fees and costs. The law provides that violation of WAC 284-30-350 is a violation of the Act and the Court can find up to treble damages for a violation of this provision plus award attorney fees and costs. WAC 284-30-150 Misrepresentation of Policy Provisions states:

(1)  No insurer shall fail to fully disclose to first party claimants all pertinent benefit coverages or other provisions of an insurance policy or insurance contract under which a claim is presented

(2)  No agent shall conceal from first party claimants benefits, coverages , or other provisions of an insurance policy or insurance contract under which a claim is presented.

COMPLAINT FOR DISABILITY BENEFITS- 31

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

\* \* \*

(7) No insurer shall make a payment of benefits without clearly advising the payee, in writing, that it may require reimbursement

The Insurance Fair Claims Act (IFCA) RCW 48.30.015 states in pertinent part:

(1)     Any first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer can bring an action to recover actual damages sustained, together with the costs of the action, including reasonable attorneys; fees and litigations costs.

(2)     The superior court may … after a finding of a violation of a rule in subsection (5) of this section, increase the total award of damages to an amount not to exceed three times the actual damages.

(3)     The superior court shall … after a finding of a violation of a rule in subsection (5) of this section award reasonable attorneys' fees and actual and statutory litigation costs, including expert witness fees, to the first party claimant of an insurance contract who is the prevailing party in such action.

(4)     "First party claimant" means an individual… asserting a right to payment as a covered person under an insurance policy or insurance contract arising out of the     … contingency or loss covered by such a policy or contract.

(5)     A violation of any of the following is a violation for the purposes of  subsections (2) and (3) of this section.

> (a) WAC 284-30-330, captioned "specific unfair claims settlement practices defined"
> (b)  WAC 284-30-350, captioned "misrepresentation of policy provisions."

 **(6)     This section does not limit a court's existing ability to make any other determination regarding an action for an unfair or deceptive practice of an insurer or provide for any other remedy that is available at law.**

Equitable and legal considerations abound against your claim for repayment of the alleged overpayment of $36,000.  In light of your denial of this claim, at

COMPLAINT FOR DISABILITY BENEFITS- 32

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

the very least you should waive the overpayment claim.  At most, you will owe treble damages on the unpaid back benefits, plus attorney fees and costs in addition to the back benefits.  As you know, Mr. DuWors requested a copy of his application and benefit statement on a number of occasions.  These are evident in the many phone calls made to Mary Cape[Telephone Call Center Log].  Unfortunately, to this day, no one has provided him a copy of this information.  In January 2014, Mr. DuWors was surprised to learn that the checks you were sending him regularly for 36 months were for the wrong amount in light of the applicable policy and documents which you never sent him.  He would have made different plans for his funds if he knew he would be getting less money than you were sending him.  You ignored his requests for information which would have alerted him much earlier to a potential overpayment.  Now that money is gone as he has relied on your payments for necessary expenses.  For instance, Mr. DuWors used his savings to pay for a new car about 8 months before you notified him that you had misrepresented his benefit amount for 36 months. The decision to buy the car was based on an understanding that he would be receiving disability benefits as he had been all along at $5500/month.  As noted above, the Mary Cape telephone log which you have in your files shows the numerous times Mr. DuWors called to try to get copies of his application and his statement of benefits which would set out the correct benefit amount.  These many calls went unanswered and the benefit continued to be paid at $5000 per month.  You still never provided the Benefit Statement for his policy until we received an emailed copy this morning.  You precipitously reduced the benefit payment to $4000 per month and demanded he repay you $36,000, the amount you calculated as being overpaid.  At this time, we have no dispute over the benefit amount going forward ($4000 per month – the benefit statement provided today by Cynthia Hopkins makes that clear).  However we believe the misrepresentations of the benefit amount in at least 36 consecutive checks and the failure to provide requested information to Mr. DuWors (his application and the benefit statement) establishes the equities in favor of Mr. DuWors with respect to back payments, and leads us to ask you to not only reinstate Mr. DuWors wrongly denied benefits, but also that you waive the $36,000 claimed overpayment.

I would also like to address the record review by Raye Bellinger MD done on or about January 8, 2014 and was the primary basis for denying Mr. DuWors claim.  First of all, Dr. Bellinger fails to address any of the concerns set out in the discussion of common care and prudence.  Dr. Bellinger does not address whether or not Mr. DuWors increases his risks to his health and life by the inevitable stresses produced by working in a job based on his education, training, and experience.  Furthermore, Dr. Bellinger places considerable weight on the exercise test of 10/15/2013, focusing on the METS achieved.  A more careful review shows that the LVEF was reduced and was 40% (not a normal finding) and Mr DuWors also had  "occasional PVCs at rest….There was an increase in PVC's toward the end of the stress portion of the test and

COMPLAINT FOR DISABILITY BENEFITS- 33

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

early during the recovery phase." The Rest Echo provided an ejection fraction estimate of 40%. It also showed "akinesis of the med to distal septum, apex and distal anterior wall." "The wall motion abnormalities at rest were also noted with stress. …" The Baseline Doppler showed "trace to mild mitral regurgitation…trace aortic regurgitation…[and] trace bicuspid regurgitation. So while Dr. Bellinger was correct in noting that Mr. DuWors achieved 8 minutes of exercise to 10 METS, Dr. Bellinger deliberately left out the abnormal findings, finding which Dr. Rodrigues made and considered in his evaluations and opinions. Dr. Rodrigues's knowledge of Mr. DuWors and his cardiac condition can provide much more reliable evaluations of his ability to work and the risks he faces than Dr. Bellinger.

We are also attaching medical records that do not appear to be in the materials you provided to us. These records also indicate the diagnosis of benign essential hypertension. The records include an exercise stress test conducted on 10/15/2012 by Dr. Rodrigues. On this test Dr. Rodrigues noted that Mr. DuWors developed lightheadedness and fatigue during the stress exam. Based on this testing, these records also indicate that Dr. Rodrigues diagnosed a cardiomyopathy based on an ejection fraction of 40 at that time as well. On the baseline echo, the resting Left Ventricle ejection fraction was estimated at 35-40%. This is not a normal finding. The stress test was a normal test for ischemia, but the peak stress ejection fraction was approximately 40-45%. There was mild regurgitation at the tricuspid valve, but no regurgitation at the aorta. It notes there are mild changes since a previous study. In his note from the November 21, 2012 visit he notes that Mr. DuWors had palpitations from PVC's, bothersome to Mr. DuWors until placed on medication, but concerning for his LV[left ventricular] systolic function. The records also include the Ablation procedure 11/30/2012. We also include records from Dr. Rodrigues beginning 10/1/2013. This is a telling note as the History of Present Illness states:

> Robert J Duwors is a 61 y.o male who had a recent episode of possible atrial flutter with rate of 100/min. –associated with fatigue symptoms and feeling 'crappy that lasted 6 hours and resolved spontaneously after 6 hours.

> Does occasionally have increased PVC incidence –but this has improved post ablation. …

Dr. Rodrigues' October 15, 2013 note provides a report of a Stress Echo which showed reduced functional aerobic capacity with a resting LVEF 40% , isolated mostly uniform V ectopy but some multiform and increase in frequency at higher levels of exertion/improvement in LVEF post exercise to 55% with an increase in contractility in areas of the myocardium not affected by the MI.

COMPLAINT FOR DISABILITY BENEFITS- 34

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

Mon 12/3/13, Mary Hall ARNP saw Mr. DuWors.  She notes that he is experiencing frequent PVC's.  The History of Present Illness states:

> This is a 61-year-old dominant returns to clinic today for followup of his symptomatic PVCs and blood pressure spikes.  He reports B/P spikes 2-3 times per week.   He feels tired and lack of concentration/restless feeling when his blood pressure is up, like it is at the moment.  He feels best with his blood pressure around 120/70.  He has intermittent frequent PVCs associated with breathlessness and anxiety feelings. His symptoms are aggravated by stress and tight deadlines.

Her Impression at that visit states:

1. **PVCs.**  The patient will avoid stressful situations and continue his current dose of carvediol 25 mg twice dialing.  He has not hand any syncope.
2. **Hypertension**.   The patient has not been watching his sodium intake. He is reluctant to added any medicine to his medical regimen at this time. …
3. **Ischemic cardiomyopathy with ejection fraction of 40%.**

On 2/7/2014 Mr. DuWors returns to Dr. Rodrigues' office and with a visit with Mary Hall again.  His complaints include arrhythmias, high blood pressure, and fatigue.  These are problems which Mr. DuWors has discussed in his personal statement.  Under History of Present Illness, Mary Hall wrote:

This is a 61 year old male who has been having increased BP and intermittent palpitations.  He thinks it could be related to stress.  He feels very tired and distracted when his blood pressure is high. …

Under Impression, May Hall wrote:  "the patient is encouraged to avoid stress in efforts to control his blood pressure."

  The last note is a record of the June 1, 2014 visit with Dr. Rodrigues that Dr. Rodrigues discusses in his report.  **Again, Mr. DuWors reports noticing a decline in his stamina.  Also he reports  increased symptomatic ventricular arrhythmias**.  These are attributed to learning of the denial of his disability claim.

  In general, these records corroborate the personal statement of Mr. DuWors and provide part of the foundation for Dr. Rodrigues' report.

COMPLAINT FOR DISABILITY BENEFITS- 35

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

1

2

3

4

5

6

7

8

Finally we would like to point out that, as you know, Mr. DuWors has qualified for Social Security Disability payments.  While you point out that there are differences between SSD disability and LTD disability, you fail to recognize that the SSD definition of disability is more restrictive than the any occupation definition in at issue here.  To qualify for his SSD benefits, Mr. DuWors had to convince Social Security that he was unable to do any job in the national economy.  Social Security has recognized that Mr. DuWor's heart condition qualifies him for benefits.  You have taken the advantage of his grant of SSD benefits by taking the offset and requiring that Mr. DuWors repay any "overpayment" due to the receipt of SSD benefits [$48,000].   Under this circumstance it is tantamount to an abuse of discretion to simply dismiss the SSD award and its underlying support without having a reasoned opinion as to why it carries no weight.

9

10

11

12

13

14

15

16

17

18

19

20

21

This letter and the attached materials constitute Mr. DuWors appeal.  We have attached a current report from Dr. Rodrigues, Mr. DuWors treating cardiologist, the doctor who has personally evaluated and examined Mr. DuWors many times.  We have also included a personal statement from Mr. DuWors where he describes the effects of his cardiac condition, and the restrictions and limitations these conditions produce, along with the significant risk to his life and health if he would attempt to return to work.  We have attached records you appear not to have in your files.  You need nothing further to enable you to reinstate his benefits under the doctrine of common care and prudence, well-accepted in insurance law.  **As Mr. DuWors suggests, if any cardiologist says he can work, as your reviewing cardiologist does based on a record review,  he would be glad to change hearts with that cardiologist.**  It is very clear that if Mr. DuWors returned to work in any occupation consistent with his education, experience, and training, the work would create an unacceptable adverse risk to Mr. DuWors' health and life.  We believe this is what a court would find if you persist in denying his benefits.  Furthermore, it is in everyone's interest to avoid litigation.  You face the potential for an IFCA violation leading to as much as treble damages on back benefits owed as well as attorney fees and costs.  Mr. DuWors risks his health and life due to the stress caused by your withholding his benefits.  Therefore we request you reverse your decision to deny benefits, and agree to waive the overpayment you have been seeking.

22

23

24

25

26

84. There are also imperatives at PRUDENTIAL that probably played a role in the termination of Plaintiff DuWors as can be seen in what PRUDENTIAL posts on its website and we printed Wednesday March 26, 2015 included as Appendix 1 entitled "PRUDENTIAL CEO Vows to Fix Disability Business."

COMPLAINT FOR DISABILITY BENEFITS- 36

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

85. In that document, the PRUDENTIAL CEO told investors that PRUDENTIAL is "moving aggressively to correct" the "clear performance issues" that have beset its disability insurance business which led to an unexpected first quarter loss for 2012. They reported a $38 million loss for the quarter compared with net income of $39 million the year-ago quarter in 2011.

86. In Appendix 2, a news release dated February 5, 2014, PRUDENTIAL explains one way it improved its bottom line in 2012: improved group insurance claims experience. This means in plain English they did not pay out as much in claims, which may very well include Mr. DuWors experience and other claimants in which PRUDENTIAL denies claims they should be paying based on internal pressure to improve "claims experience."

87. PRUDENTIAL further brags on its website to entice investors: "The Group Insurance segment reported adjusted operating income of $58 million in the current quarter, compared to a loss of $12 million in the year-ago quarter. Results for the year-ago quarter included a charge of $20 million to increase legal reserves. Excluding this charge, adjusted operating income increased $50 million from the year-ago quarter. **This increase came primarily from improved group life and group disability claims experience** in the current quarter."   Appendix 2, Page 4 of 17.

88. Furthermore, the yearend numbers from 2012 to 2013 show a near 50% decline in New Business Premiums ($135 million to $73 million). Group Life New Business Premiums also show the downward slide ($439 million in 2012 declining to $313 million in 2013).

COMPLAINT FOR DISABILITY BENEFITS- 37

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

89. Thus PRUDENTIAL's gains based on "improved group disability claims experience" come straight out of the pockets of the insureds, like Plaintiff DuWors, especially existing ones. Indeed they saved enough by "improving claims experience" to cover a significant collapse of sales. It is therefore likely that in depth audit of the PRUDENTIAL's Group Insurance financial statements and individual claim histories will make this more clear: a pervasive culture of mistreating new and existing claims for financial gain much like the insurance commissioners audit of UNUM claim practices found leading to Reassessment of claims and other remedies. So there remains reason to believe that Mr DuWors story is not unique, as it appears that PRUDENTIAL has been putting its financial interests ahead of the insured on a huge scale.

## FIRST CLAIM
## REINSTATEMENT OF DISABILTY BENEFITS

90.  Plaintiff realleges and incorporates by reference those allegations in the complaint set forth in paragraphs 1-67 above.

91. Insurers in Washington must put the interests of their insured above their own financial interests acting with good faith and fair dealing on insurance claims, such as the claim at issue in this case.

92. The doctrine of common care and prudence is well established in disability cases. The claim is very simple: an insured is deemed disabled if working creates an unacceptable risk of further disability or death.  *See Lasser v. Reliance Standard Life Insurance Co.,* 146 F. Supp. 2d 619, 628 (D.N.J. 2001)(quoting 1C *Appleman Insurance Law & Practice* § 651 at 241 (1981)), *aff'd,* 344 F.3d 381 (3d Cir. 2003).). *Pompe v.*

COMPLAINT FOR DISABILITY BENEFITS- 38

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

*Continental Cas. Co., 119 F. Supp. 2d 1004, 1010 (W.D. Mo. 2000)*("Such an approach would force patients with serious health risks to cripple themselves, or even risk death, in order to be considered disabled. . . The law is not so harsh.") (citing *Herring v. Canada Life Assur. Co., 207 F.3d 1026 (8th Cir. 2000)); See Stark v. Weinberger, 497 F.2d 1092, 1098-99 (7th Cir. 1974); Oppenheimer v. Fomch, 495 F.2d 396, 398 (4th Cir. 1974); Stillwell v. Sullivan, 1992 U.S. Dist. LEXIS 20242, 1992 WL 401971*, \*6 (D. Kan., Dec. 30, 1992); E.L. Kellett, Annotation, Continuation of Work as Affecting Finding of Total or Permanent Disability within Insurance Coverage, 24 A.L.R.3d 8, § 3(a) (1969); see, e.g., *McGowan v. Orleans Furniture Inc., 586 So. 2d 163, 166 (Miss. 1991); John Hancock Mut. Life Ins. Co. v. Poss, 154 Ga. App. 272, 267 S.E.2d 877, 880 (Ga. App. 1980); Honeysucker v. Bowen*, 649 F. Supp. 1155, 1162 (N.D. Ill. 1986). *Schlabach*, 469 F. Supp. at 314; *Avemco Life Ins. Co. v. Luebker, 240 Ark. 349, 399 S.W.2d 265 (Ark. 1966).*

93. It appears that PRUDENTIAL and its reviewers have overlooked the substantial risk PLAINTIFF DUWORS medical conditions present for him. *See Appendices 1 and 2* which discuss the risks involved with Mr. DuWors diagnoses of atrial fibrillation, atrial flutter, and ventricular tachycardia.

94. Applying the doctrine of common care and prudence to this claim, it should be clear that Plaintiff DuWors heart conditions create a substantial risk of death or further deterioration of his quality of life as working increases his risk of death or increased disability because of atrial fibrillation, atrial flutter, and ventricular tachycardia. *See Appendices 1 and 2.*

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

95. It is work in any job in the national economy that led the Social Security Administration to grant SSD benefits to PLAINTIFF DUWORS.

96. Both PLAINTIFF DUWORS and his very experienced and knowledgable treating physician Dr. Rodrigues establish that the Plaintiff cannot be expected to work any occupation for which he is qualified based on his education, training, and experience.

97. Dr. Rodriguez, with his intimate familiarity with Plaintiff DuWors medical condition, has unequivocally stated that he does not believe his patient can work any job that requires him to show up and be productive 8 hours a day, 7 days per week, 52 weeks per year, year after year.  He expects, as his experience with Mr. DuWors proves out, that Plaintiff DuWors will miss time regularly and unpredictably because of his heart conditions which are brought on by simple stresses, physical and emotional, inherent in any work situtation.

98. PRUDENTIAL acknowledges that Plaintiff DuWors has no limit due to any psychiatric condition.

99. Therefore the risks presented by atrial fibrillation (for which a trial defibrillator failed and had to be removed) and ventricular tachycardia with the accompanying risk of ventricular fibrillation, both brought on unpredictably by simple activity or stresses, will be a greater risk for Plaintiff DuWors if he is required to meet a work schedule, do the work he is experienced to do, and make it day after day, week after week, month after month without inevitably causing the atrial fibrillation or ventricular fibrillation to either kill him or significantly further impair his quality of life.

100.     This is the type of medical condition for which workers buy disability coverage so they do not have to kill themselves to keep working.

COMPLAINT FOR DISABILITY BENEFITS- 40

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

101.     The Court should reinstate PLAINTIFF DUWORS long term disability

benefits.

## SECOND CLAIM
## PENALTY FOR VIOLATION OF THE INSURANCE FAIR CLAIMS ACT
## RCW 48.30.015

102.     Plaintiff realleges and incorporates by reference those allegations set forth in

paragraphs 1-100 of this complaint.

103.     Plaintiff was entitled to LTD benefits because he has been and continues to be

disabled since January 2014.

104.     PRUDENTIAL unreasonably terminated Plaintiff's LTD benefits in their

January 27, 2014 letter and stopped paying Plaintiff's LTD benefits that same day.

105.     PRUDENTIAL unreasonably terminated Plaintiff's LTD benefits in their

January 27, 2014 letter to Plaintiff.

106.     Defendants violated WAC 284-030-330, which defines specific unfair claims

practices for purposes of IFCA .  These unfair claims practices include

misrepresenting insurance policy provisions; refusing to pay claims without

conducting a reasonable investigation; compelling an insured to commence litigation

to recover amounts due under the policy; making payment under a claim without

setting forth an accompanying statement setting out  the coverage under which the

payment is made.  *See* Appendix 6.

107.     PLAINTIFF DUWORS  sent the required IFCA notice by letter dated February

6, 2015 to the Washington Insurance Commissioner and also sent a copy of the same

COMPLAINT FOR DISABILITY BENEFITS- 41

**KRAFCHICK LAW FIRM PLLC**
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

letter notice with attachments to PRUDENTIAL.  *See* Appendix 5 for the IFCA notice sent to PRUDENTIAL and the Washington Insurance Commissioner.

108.     More than 20 days have elapsed and we have not had any reversal of the decision to terminate benefits by PRUDENTIAL.

109.     Plaintiff DuWors is entitled to up to treble damages, costs, and attorney fees from Defendant PRUDENTIAL for their violations of WAC 284-30-330 and IFCA, RCW 48.30.015.  Appendices 5 and 6.

## **PRAYER FOR RELIEF**

WHEREFORE , Plaintiff DuWors prays for judgment against Defendant PRUDENTIAL and Trust A as follows:

A.  An order that Plaintiff DuWors is entitled receive his long term disability benefits under PRUDENTIAL policy 22560, funding disability benefits under Trust A.

B.  An order that in handling Plaintiff DuWors claim, PRUDENTIAL violated the Insurance Fair Claims act by unreasonably denying PLAINTIFF DUWORS  disability claim, Plaintiff seeks an order awarding the maximum allowed, treble actual damages.

C.  An order awarding attorney fees and costs to Plaintiff DuWors that he has incurred making his claim with required legal help and bringing this case under IFCA or under any other applicable Washington law.

D.  An order extinguishing the PRUDENTIAL claim for $36000 repayment of claimed overpayments, and an order establishing coverage by estoppel and a benefit payment of $5500 per month.

COMPLAINT FOR DISABILITY BENEFITS- 42

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

1    E.  Such other relief permitted under applicable law that the Court deems just and

2        equitable.

3

4        Respectfully submitted this  24th day of  April 2015

5                                   KRAFCHICK LAW FIRM PLLC

6

7                          By:      s/ Steven P. Krafchick
                                 Steven P. Krafchick, WSBA# 13542

8                                KRAFCHICK LAW FIRM, PLLC
                                 100 W. Harrison, South Twr, Ste 300

9                                Seattle, WA    98119

10                               Phone: 206-374-7370
                                 Fax: 206-374-7377

11                               Email: klf@krafchick.com

12                               Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DISABILITY BENEFITS- 43

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE S300
SEATTLE, WASHINGTON  98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM